GORDON L. NORBERG, Plaintiff, v. CENTEX HOMES CORPORATION, Defendant and Third-Party Plaintiff-Appellee (R & D Thiel, Inc., Third-Party Defendant-Appellant).

First District (6th Division)   No. 1—91—2498

Opinion filed January 22, 1993.—Modified on rehearing April 30, 1993.

Greenberg, Keele, Lunn & Aronberg, of Chicago (Mitchell S. Goldgehn and Gene H. Hansen, of counsel), for appellant.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Michael A. Pollard, Richard B. Foster III, and Moira Ann Dages, of counsel), for appellee.

JUSTICE EGAN delivered the opinion of the court:

The plaintiff, Gordon L. Norberg, filed suit against the defendant, Centex Homes Corporation (Centex), to recover damages for personal injuries he suffered while working as a carpenter at a building site being developed by Centex. Centex filed a third-party complaint against the plaintiff's employer, R & D Thiel, Inc. (Thiel), for contribution.

At the time of the plaintiff's injury, Thiel had been insured under a workers' compensation and employer's liability policy with Optimum Insurance Company (Optimum). However, Optimum was placed in liquidation, and the Illinois Insurance Guaranty Fund (Fund or Guaranty Fund) undertook Optimum's obligations with respect to the defense and indemnification of Thiel.

The case was heard by a jury. The evidence established that the plaintiff was working for Thiel as a trim carpenter installing permanent railings around a stairwell opening on the second floor of a townhouse. There was no temporary guardrail around the stairwell. The contract between Centex and Thiel expressly provided that Thiel was responsible for erecting a temporary guardrail around the stairwell opening. The plaintiff had not been instructed by Thiel to have a temporary guardrail in place while he installed the permanent guardrail. While the plaintiff was drilling a hole at the top of the stairwell, he slipped and fell down the stairs and was injured.

The jury returned a verdict on April 16, 1991, in favor of the plaintiff and against Centex. The jury calculated the plaintiff's damages to be $380,438.24, but found the plaintiff 20% contributorily negligent. Accordingly, they awarded $304,350.59 to the plaintiff. The jury also returned a verdict on Centex's third-party complaint and held Thiel 50% liable for the judgment.

On April 18, 1991, the plaintiff requested that a written judgment order be entered *nunc pro tunc* confirming the jury verdict that had been rendered on April 16. The judge granted the request and signed the written judgment order on April 18.

Also on April 18 the Illinois Supreme Court filed its opinion in *Kotecki v. Cyclops Welding Corp.* (1991), 146 Ill. 2d 155, 585 N.E.2d 1023, holding that an employer's liability for contribution is limited to the extent of its workers' compensation liability. That same day, Thiel filed a motion to conform the judgment to reflect the holding of *Kotecki* and a motion to limit Centex's recovery to the amount allowed under the Illinois insurance guaranty fund act. (Ill. Rev. Stat. 1989, ch. 73, par. 1065.82 *et seq.*) The judge denied both motions; he held that the *Kotecki* decision would apply prospectively to cases that began trial on or after April 18, 1991, and would not apply retroactively to cases in which trial had begun before April 18, 1991.

Centex settled with the plaintiff for $260,000, reserving its right of contribution from Thiel. The trial judge reviewed the settlement and entered a finding under the Contribution Act (Ill. Rev. Stat. 1989, ch. 70, par. 301 *et seq.*) that the settlement was in good faith.

Thiel first maintains that *Kotecki* should be applied retroactively, and Centex maintains that Thiel has waived its right to contest the limits of contribution liability of an employer because Thiel did not raise the claim until after the jury verdict.

We note initially that both sides have taken inconsistent positions. In urging that Thiel has waived the argument, Centex contends that Thiel should have been aware of its right to claim a limitation on the extent of its liability for contribution before *Kotecki* was decided. On the other hand, in arguing that *Kotecki* should be given prospective application, Centex insists that *Kotecki* was in fact new law. Thiel insists that it did not waive its right to raise its argument until after the trial because it could not have anticipated the *Kotecki* opinion. But, in arguing that *Kotecki* should have retrospective application, Thiel maintains that *Kotecki* was not a change in the law but rather an "evolution" of the law.

We believe that Centex's claim that Thiel waived its argument here is not to be dismissed lightly, particularly when we consider the concession made by Thiel, perhaps unwittingly, in its brief in this court:

> "While litigants did not know the result prior to its filing, *the Kotecki decision came as no great surprise.* Undoubtedly, Defendant Centex's counsel was, *like the rest of the Illinois trial bar, monitoring this decision.* That Centex finds the decision not to its liking is no surprise, but *Kotecki* is applicable to this case." (Emphasis added.)

We further judge, however, that if waiver is present here, we should not invoke it.

The *Kotecki* opinion was published on April 18, 1991. It did not say expressly whether its application was to be prospective or retroactive. The opinion was without a dissent. Two justices abstained from participating. On May 9, the third-party plaintiff filed a petition for rehearing and alternatively requested that the opinion be modified to provide expressly that it was to apply only prospectively. On December 2, the supreme court denied the petition for rehearing with one justice dissenting and again with two justices abstaining from participation. The dissenting justice said that the opinion at least should address the question of whether the application of the opinion should be applied retroactively or prospectively. *Kotecki,* 146 Ill. 2d at 174 (Freeman, J., dissenting).

In *Hux v. Raben* (1967), 38 Ill. 2d 223, 230 N.E.2d 831, the supreme court said that the responsibility of a reviewing court for the maintenance of a sound and uniform body of precedent may override the considerations of waiver. We are not concerned here with the maintenance of a precedent but rather with the establishment of a precedent. Nonetheless we believe the rationale of *Hux v. Raben* is applicable here. The time of the application of *Kotecki* must be decided sometime by a reviewing court. Moreover, if we held that Thiel had waived the argument and the supreme court disagreed with our holding, it is not unlikely that the supreme court would remand the case to this court for the resolution of all remaining issues. (*Cf. Waste Management of Illinois, Inc. v. Illinois Pollution Control Board* (1991), 145 Ill. 2d 345, 585 N.E. 2d 606.) For the sake of finality, therefore, we will disregard any possible waiver of Thiel's right to claim the application of *Kotecki,* and we will decide whether *Kotecki* should be applied prospectively or retroactively.

Thiel maintains that decisions are to be applied retroactively "unless the court expressly declares that its decision is a clear break with the past, such as when a court explicitly overrules its own past precedent, disapproves a practice \*\*\* it \*\*\* previously approved, or overturns a well-established body of lower court authority," citing *Larrance v. Human Rights Comm'n* (1988), 166 Ill. App. 3d 224, 230, 519 N.E.2d 1203. A case is generally governed by the law as it exists when the judgment is rendered, not when the case is brought. *GTE Automatic Electric Inc. v. Allphin* (1976), 38 Ill. App. 3d 910, 913, 349 N.E.2d 654, *aff'd* (1977), 68 Ill. 2d 326, 369 N.E.2d 841.

■■ However, courts have inherent power to determine whether their decisions should be applied prospectively or retroactively. (*Larrance,* 166 Ill. App. 3d at 230.) Whether a decision will be limited to prospective application depends upon whether the decision establishes a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. (*Elg v. Whittington* (1987), 119 Ill. 2d 344, 518 N.E.2d 1232.) If the decision establishes a new principle of law, the court should balance both sides of the issue in question by determining whether prospective application will advance or hinder the purpose of the rule, and the court should also consider whether there is any injustice or hardship in holding the decision retroactive. *Castaneda v. Illinois Human Rights Comm'n* (1989), 132 Ill. 2d 304, 329, 547 N.E.2d 437, 448.

Before the *Kotecki* case was decided, the supreme court held that contribution claims against employers were not barred by the Workers' Compensation Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.1 *et seq.*). (*Doyle v. Rhodes* (1984), 101 Ill. 2d 1, 461 N.E.2d 382.) The court in *Doyle* added the following:

"In this connection, however, we feel compelled to invite the attention of the parties to the possible relevance of the provisions of section 5(b) of the Workers' Compensation Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.5(b)). \*\*\* The extent to which any right of contribution from the employer under the Contribution Act may impact upon this right of recoupment by the employer has not been raised by the parties in their pleadings and consequently not briefed. At this point, absent the assistance of any guidance by the third-party plaintiff and the employer, and bearing in mind that this case is still at the pleading stage, we are not prepared to indicate how this

aspect of the Compensation Act may affect the operation of the Contribution Act or what adjustments will be necessary because of the recoupment provision. Nevertheless, we caution that some accommodation between these two statutes may be in order." (*Doyle*, 101 Ill. 2d at 14-15.)

Exactly what "accommodation" would be necessary was not indicated in *Doyle*.

After surveying the law of other States, the Illinois Supreme Court resolved this issue in *Kotecki* and adopted the Minnesota Supreme Court's position, holding that an employer's liability for contribution would be limited to the extent of its liability for workers' compensation payments.

We do not agree with Thiel that the supreme court in *Kotecki* "took care to emphasize that it was not announcing a 'change' in the law previously stated in *Doyle v. Rhodes*." Rather, the supreme court took care to emphasize that in *Doyle v. Rhodes* it had not decided the question of the extent of an employer's liability for contribution:

> "Contrary to [the third-party plaintiff's] suggestion, the question, as to whether or not there is a limit on the amount that an employer may be found liable for, was not answered in *Doyle*." *Kotecki*, 146 Ill. 2d at 162.

The majority in *Kotecki* addressed the third-party plaintiff's claim that a limitation on the amount of contribution would require a "change" in the law and that any "change" should be left to the legislature. In rejecting that argument the court referred to *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, which abolished the doctrine of contributory negligence despite the presence of six bills in the legislature:

> "The preceding discussion of legislative inaction prior to *Alvis* concerned a 'change' to be made in the common law. That discussion is equally applicable here, where the 'change' concerns how this court reconciles two, potentially conflicting, statutes." *Kotecki*, 146 Ill. 2d at 162.

We read the majority opinion in *Kotecki* to be a recognition that its holding constitutes a change in the law. There is no doubt about the position of the dissenting justice:

> "The rule established in this cause is *so fundamental a change in the law of contribution* that this court should avoid unnecessary confusion by the bench and bar of Illinois as to its application by explicitly stating whether it is to be applied

retroactively or prospectively." (Emphasis added.) (*Kotecki*, 146 Ill. 2d at 174 (Freeman, J., dissenting).)

We conclude, therefore, that the supreme court recognized that in *Kotecki* it established a new principle of law. That being so, we must next decide whether retroactive application of *Kotecki* would hinder or advance its application and whether retroactive application would create an injustice or hardship.

Thiel has not advanced any reason why retroactive application of *Kotecki* to cases which have been tried before *Kotecki* was decided would further its application. Instead, Thiel seeks only to deprecate Centex's argument that the *Kotecki* decision substantially affects the liability among the parties and their respective trial strategies. Centex extends that argument on the question of hardship by pointing out that a direct defendant might be better served by abstaining from filing a third-party action against a culpable employer. The judge accepted that argument. He pointed out, and we paraphrase, that a jury, unaware of the limitation of the employer's liability, might be more likely to return a larger verdict against two defendants than it would against only the direct defendant. We agree with the reasoning of the trial judge. Unable to foresee the result in *Kotecki*, many defendants undoubtedly made a different strategic decision, and retroactive application of *Kotecki* to these defendants would be unjust.

The Federal cases cited by Thiel support a limitation of its application to cases in which trial had not commenced on the date that the *Kotecki* opinion was filed. All of those cases involved pretrial proceedings. See *Doran v. Corn Products-U.S.* (N.D. Ill. 1991), 776 F. Supp. 368; *Moore v. Wausau Club* (N.D. Ill. 1991), 777 F. Supp. 619; *Fosco v. Transport International Pool* (N.D. Ill. Sept. 19, 1991), No. 91—C—62; *Kalp v. American Can Co.* (N.D. Ill. May 17, 1991), No. 90—C—4910.

■ Because the *Kotecki* opinion was a case of first impression which was not *clearly* foreshadowed by *Doyle* and because retroactive application of the decision would hinder its application and result in prejudice to many defendants, we hold that the *Kotecki* decision applies only to cases in which trial had not yet commenced on the date the *Kotecki* opinion was released. In view of our holding, it is unnecessary to discuss Thiel's argument that *Kotecki* was decided before a formal judgment order was entered. That part of the trial judge's order denying Thiel's motion to limit its liability in contribution to the extent of its workers' compensation liability is affirmed.

We turn now to Thiel's claim that Centex is barred from recovering from the Guaranty Fund more than the amount of its deductible of $100,000. The effect of the trial judge's order was to require the Fund to pay Centex $130,000.

■ The Illinois insurance guaranty fund act (the Act) was established to protect policyholders against the insolvency of their insurers. (Ill. Rev. Stat. 1989, ch. 73, par. 1065.82; *Lucas v. Illinois Insurance Guaranty Fund* (1977), 52 Ill. App. 3d 237, 367 N.E.2d 469.) The Guaranty Fund obtains its funds by assessing all insurance companies licensed to transact business in the State of Illinois based upon a percentage of their net direct written premiums. (Ill. Rev. Stat. 1989, ch. 73, par. 1065.87—6.) Those assessments are passed along to the insurance-buying public in the form of higher premiums. (*Adams v. Illinois Insurance Guaranty Fund* (1980), 85 Ill. App. 3d 867, 407 N.E.2d 638.) When an insurer is declared insolvent, the Fund assumes the defense of that company's insureds. In this case, the Fund took over Centex's defense when its insurer, Optimum Insurance Company of Illinois, was declared insolvent.

The Fund covers all claims covered under the policy except:

> "any claim for any amount due any reinsurer, insurer, insurance pool, or underwriting association as subrogated recoveries, reinsurance recoverables, contribution, indemnification or otherwise. No such claim held by a reinsurer, insurer, insurance pool, or underwriting association may be asserted in any legal action against a person insured under a policy issued by an insolvent company other than to the extent such claim exceeds the Fund obligation limitations set forth in Section 537.2 of this Code." Ill. Rev. Stat. 1989, ch. 73, par. 1065.84—3(b)(v).

■ Centex was insured under a policy issued by Travelers Insurance Company to a limit of $500,000 per occurrence with a $100,000 deductible. Thiel argues that any recovery in contribution above Centex's $100,000 deductible, which would be $30,000, is a claim "held by" Centex's insurer, Travelers, and is therefore not a covered claim under the Act. The trial judge held that Centex's claim was not "held by" Travelers because only Centex, as a joint tortfeasor, held the right to bring that action and to recover under the Contribution Act.

Many other States have enacted legislation similar to the Illinois statute. All courts construing those statutes speak with one voice when addressing the rights of solvent insurers to sums of money which would come from a guaranty fund. In the first Illinois case to

do so, *Pierre v. Davis* (1987), 165 Ill. App. 3d 759, 760, 520 N.E.2d 743, 744, the appellate court said:

> "Since all Illinois licensed insurers contribute to the Illinois Guaranty Fund, the philosophy of the Fund is to have all potential claims against the Fund's assets reduced by a solvent insurer, not the [F]und, wherever possible."

In *Pierre*, the plaintiff's workers' compensation insurer had intervened in the action seeking recovery of its statutory lien. The court held that the plaintiff could not recover damages from the Fund, because the lien made the judgment an amount due an insurer as a subrogated recovery or otherwise. Similarly, in *Herriford v. Boyles* (1990), 193 Ill. App. 3d 947, 550 N.E.2d 654, the plaintiff's insurer claimed a lien against his recovery; the court held that the insurance company's lien could not be paid from the assets of the Fund. In *Cardiel v. Warren* (1989), 191 Ill. App. 3d 816, 548 N.E.2d 1081, the plaintiff had assigned to the insurance company her entire interest in any judgment paid. The court held that the plaintiff's claim was "held by" the insurance company and, therefore, was not a covered claim under the Act.

The trial judge in this case accepted Centex's argument that *Cardiel* and *Pierre* were distinguishable because Centex had not assigned its right to Travelers and Travelers had not asserted a lien. Centex repeats that argument in this court. The issue, therefore, boils down to whether we may properly say that the claim is, in fact, held by Centex rather than Travelers.

In this court Centex takes pains to distance itself from any suspicion that Travelers will ultimately receive any money the Fund might pay Centex. We disagree with Centex that there is nothing in the post-trial proceedings that might be construed as a concession that Travelers would be the ultimate beneficiary of any money paid to Centex by the Fund. At the post-trial motion, Thiel's attorney argued that the $30,000 was going to go to Travelers. The following occurred:

> "[THIEL'S ATTORNEY]: But nobody has ever challenged the idea that it's Travelers' $30,000 we are arguing about here, not Centex'. Travelers is the real party in interest for getting its hands on that $30,000. It is not going into Centex' pocket.
>
> JUDGE: That's conceded. That ultimately Travelers would have a claim against Centex for the $30,000 that it collects.
>
> [THIEL'S ATTORNEY]: Right.
>
> JUDGE: *Everybody agrees with that.*

* * *

[THIEL'S ATTORNEY]: I mean, eventually that $30,000 is Travelers' claim and they're going to want their money. It's not going to be money that goes into the pocket of Centex. It's going to be money that goes into the pocket of Travelers.

JUDGE: Yes, but that's not what the statute prohibits. That's the problem I have. The statute doesn't prohibit them from just—you know, Centex distributing the whole $130,000 to Travelers, if they felt generous, saying 'You folks had the usual expense for a defense, ah, we'll just give it to you.'

* * *

[THIEL'S ATTORNEY]: You're not denying that the $30,000 is Travelers'?

[CENTEX'S ATTORNEY]: I don't honestly know where it's going to go, Gene. I really don't, how its [sic] going to get parceled out.

JUDGE: The assumption would be that they would.

[CENTEX'S ATTORNEY]: The assumption would be that it's going to go to Travelers. I agree with that.

* * *

JUDGE: I have a very strong suspicion that $30,000 is going to wind up in Travelers' hands.

[THIEL'S ATTORNEY]: $30,000 would wind up in Travelers' hands.

THE COURT: Exactly." (Emphasis added.)

We believe that colloquy between the judge and counsel discloses a tacit concession that Travelers would ultimately take steps to insure that the $30,000, or at least a part of it, went to Travelers. Indeed, a strong argument may be made that the agents for Travelers would be acting in violation of their fiduciary obligations to Travelers if they did not take such steps.

Centex also argued in the trial court and continues to argue in this court that, since Illinois does not permit direct actions against insurers, Travelers could not pursue a contribution claim against Thiel. The trial judge's acceptance of that argument appears to be the linchpin of his holding. We believe the recent case of *Prudential Insurance Co. v. Romanelli* (1993), 243 Ill. App. 3d 246, is a clear answer against Centex's argument. In that case Prudential settled a claim against its insured, who had filed a claim for contribution against a third party. The trial judge ordered that Prudential pursue its contribution claim in its own name. The appellate court up-

held the order on the ground that Prudential became the subrogee of its insured under the express provisions of the Contribution Act. (Ill. Rev. Stat. 1989, ch. 70, par. 302(f).) The appellate court held that Prudential became the real party in interest and that the insured no longer had any interest in the subrogated claim. So also in this case, Travelers became the subrogee of $30,000 of any claim Centex might have against Thiel for contribution. We hold, therefore, that Travelers held a "claim" for $30,000 regardless of whether it sought to formally assert it and that its claim was not a covered claim under the Act. To hold otherwise would be an invitation to insurers to avoid the intent of the Act by *sub rosa* arrangements with their insureds.

■ Thiel also argues that Centex's claim to $30,000 from the Fund is barred by what has been described as the "non-duplication of recovery" provision in the Act. (Ill. Rev. Stat. 1989, ch. 73, par. 1065.96(a).) That section of the Act provides as follows:

"Any insured or claimant having a covered claim against the Fund shall be required first to exhaust his rights under any provision in any other insurance policy which may be applicable to the claim. Any amount payable on a covered claim under this Article shall be reduced by the amount of such recovery under such insurance policy." Ill. Rev. Stat. 1989, ch. 73, par. 1065.96(a).

It is the position of Thiel that Centex must first exhaust its claim against Travelers before it may recover from the Fund. We agree with Thiel. We do not agree with Centex that Thiel has waived this argument or that the nonduplication provision refers only to uninsured motorist cases. The language of the Act imposes no such restriction on its application. We do agree with Thiel that if the claim asserted by Centex is a covered claim, Centex is obliged to exhaust its right to $30,000 from Travelers first. A strong argument may be made that the nonduplication provision was designed to prevent any *sub rosa* arrangements between an insured and a solvent insurer at the expense of the Fund.

For these reasons we reverse that part of the order which denied Thiel's post-trial motion to limit Centex's recovery to $100,000 from the Fund.

Judgment affirmed in part and reversed in part.

McNAMARA, P.J., and RAKOWSKI, J., concur.