# Illinois Official Reports

## Appellate Court

---

*McChristian v. Brink*, 2016 IL App (1st) 152674

---

Appellate Court
Caption

JACQUELINE McCHRISTIAN, Plaintiff-Appellant, v. DALE BRINK, D.P.M., Individually and as an Agent and/or Employee of Dale S. Brink, D.P.M., Ltd., and as an Agent and/or Employee of Performance Foot and Ankle Center, L.L.C.; DALE S. BRINK, D.P.M., LTD., a Corporation; and PERFORMANCE FOOT AND ANKLE CENTER, L.L.C., a Corporation, Defendants-Appellees.

District & No.

First District, Fifth Division
Docket No. 1-15-2674

Filed

September 30, 2016

Decision Under
Review

Appeal from the Circuit Court of Cook County, No. 09-L-8204; the Hon. Janet Brosnahan, Judge, presiding.

Judgment

Certified question answered in the negative, with conditions.

Counsel on
Appeal

Larry R. Rogers and Sean M. Houlihan, of Power Rogers & Smith, P.C., of Chicago, for appellant.

James K. Horstman, Rodney E. VanAusdal, and Aimee K. Lipkis, of Cray Huber Horstman Heil & VanAusdal LLC, of Chicago, for appellees.

Panel                    PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice Reyes concurred in the judgment and opinion.
Justice Lampkin dissented, with opinion.

## OPINION

¶ 1        This is a case of first impression concerning the application of the *Petrillo* doctrine to the unique facts of this case. *Petrillo v. Syntex Laboratories, Inc.*, 148 Ill. App. 3d 581, 588 (1986). In this interlocutory appeal,[1] plaintiff claims that the trial court violated the *Petrillo* doctrine when it permitted *ex parte* communications between plaintiff's treating podiatrist and the defense counsel of the Performance Foot and Ankle Center, L.L.C., (L.L.C.), which is a defendant in this case and of which the podiatrist is a member.[2] Plaintiff asks this court a question of first impression: whether defense counsel, who represents defendant Dr. Dale Brink and defendant Performance Foot and Ankle Center, L.L.C., is prohibited from conducting *ex parte* communications with the plaintiff's treating podiatrist, Dr. Timothy Krygsheld, who is also a member, and in the control group, of defendant L.L.C.

¶ 2        Plaintiff argues that, under the *Petrillo* doctrine, *ex parte* communications are barred between plaintiff's treating podiatrist and defense counsel, in order to preserve the patient's trust and confidence in her podiatrist, as well as to honor the podiatrist's duty as a fiduciary to refrain from helping the patient's legal adversary.

¶ 3        Defendants argue that *Petrillo* does not apply to the treating podiatrist because, as a controlling member of the L.L.C. that is sued, he is not a "third party" as understood by *Petrillo*, because plaintiff consented to a lesser degree of privacy rights when she sought treatment and subsequently sued the L.L.C., which the treating podiatrist is a member of and where the treating podiatrist is in the control group. For the reasons that follow, we answer the question asked of this court in the negative, with conditions, and we reverse the order of the circuit court.

¶ 4                            BACKGROUND

¶ 5        The issue arises out of a medical malpractice suit which plaintiff Jacqueline McChristian filed against defendant Dr. Dale Brink, as well as defendant Dale S. Brink, D.P.M., Ltd.,[3] his personal corporation; and defendant L.L.C., of which Dr. Brink is a partner. All of the doctors in the L.L.C. are podiatrists.

---

[1]Pursuant to Illinois Supreme Court Rule 308 (eff. Jan. 1, 2015).

[2]A podiatrist is not a physician. "[This] State has 'long recognized podiatrists as a separate and distinct profession of healers who are severely limited in their practice and whose educational requirements are substantially different than those of physicians,' and because 'the treatments utilized by the podiatric profession *** are substantially different from those utilized by physicians and orthopedic surgeons ***.' " *Dolan v. Galluzzo*, 77 Ill. 2d 279, 281-82 (1979) (quoting *Dolan v. Galluzzo*, 62 Ill. App. 3d 832, 836 (1978)).

[3]In order to distinguish Dr. Brink from his personal corporation, we refer to him as "Dr. Brink" and his personal corporation as "Brink Ltd."

¶ 6 The complaint alleges that beginning in June 2001, Dr. Brink treated plaintiff for bilateral calluses on her feet. On January 29, 2003, he performed a Z-bunionectomy on plaintiff, after which an infection developed in her great left toe. The complaint further alleges that, on or about May 15, 2003, Dr. Brink recommended that plaintiff obtain a second opinion from Dr. Steven Stanos regarding the ulceration of the wounds on her left foot. Initial antibiotic treatment was unsuccessful, and the infection continued to worsen. On May 30, 2003, Dr. Brink and Dr. Timothy Krygsheld, D.P.M., performed surgery to remove the infected hardware that had been implanted in plaintiff's foot during the Z-bunionectomy. The infection did not improve, and on July 14, 2003, the infection necessitated the amputation of plaintiff's great left toe. Subsequently, plaintiff developed chronic regional pain syndrome. Dr. Krygsheld is now plaintiff's treating podiatrist.

¶ 7 Plaintiff filed her complaint against Dr. Brink, Dale S. Brink, Ltd., and the L.L.C. on November 17, 2009. On August 25, 2015, Dr. Brink signed an affidavit, which was attached to defendants' supplemental brief in support of their motion for a protective order, averring that he, Dr. Krygsheld, and Dr. Brian Wittmayer are the three managing members of the L.L.C.

¶ 8 In their answers to plaintiff's interrogatories, defendants named Dr. Timothy Krygsheld, plaintiff's treating podiatrist, as an expert witness. Defendants stated in their answer that Dr. Krygsheld was expected to testify regarding issues of liability, causation, and damages—all matters related to his care, treatment, observations, diagnoses, and prognoses of plaintiff. Defendants also named Vincent J. Mandracchia, D.P.M., as a controlled expert who was expected to testify to the same issues as Dr. Krygsheld.

¶ 9 Defendants' motion for a protective order states that, on August 6, 2015, defense counsel inquired of plaintiff's counsel as to whether plaintiff had any objection to defense counsel communicating with Dr. Krygsheld, and plaintiff objected on the basis that it violated the doctrine set forth in *Petrillo*, 148 Ill. App. 3d at 588. On August 13, 2015, defendants filed a motion for a protective order to allow for *ex parte* communications between defense counsel and Dr. Krygsheld, plaintiff's treating podiatrist.

¶ 10 The trial court issued a written order on September 14, 2015, permitting defense counsel to engage in *ex parte* communication with Dr. Krygsheld. On September 28, 2015, plaintiff filed for leave pursuant to Illinois Supreme Court Rule 308 to appeal the trial court's grant of the protective order, which this court granted on October 28, 2015. This appeal follows.

¶ 11 ANALYSIS

¶ 12 This interlocutory appeal requires this court to determine whether defense counsel, who represents defendant Dr. Brink and defendant L.L.C., is prohibited from conducting *ex parte*[4] communications with plaintiff's treating podiatrist, who is also a member, and in the control group, of defendant L.L.C., and to determine the extent of the *ex parte* communication.

¶ 13 As we already noted, plaintiff argues that, under the *Petrillo* doctrine, *ex parte* communications are barred between plaintiff's treating doctor and defense counsel, in order to preserve the patient's trust and confidence in her doctor, as well as to honor the doctor's duty as a fiduciary to refrain from helping the patient's legal adversary.

---

[4]*Ex parte* communications are defined as any contact between defense counsel and plaintiff's treating doctor outside the formal methods of discovery dictated by supreme court rules. *Petrillo*, 148 Ill. App. 3d at 587.

¶ 14    Defendants argue that *Petrillo* does not apply to Dr. Krygsheld because, as a controlling member of the L.L.C., he is not a "third party" as understood by *Petrillo*, because plaintiff consented to a lesser degree of privacy rights when she sought treatment and subsequently sued a medical corporation, where he is a member and part of its control group.

¶ 15                                    A. Standard of Review

¶ 16    Illinois Supreme Court Rule 308 provides a remedy of permissive appeal from interlocutory orders where the trial court has deemed that they involve a question of law as to which there is substantial ground for difference of opinion and where an immediate appeal from the order may materially advance the ultimate termination of the litigation. Ill. S. Ct. R. 308 (eff. Jan. 1, 2015). We apply a *de novo* standard of review to legal questions presented in an interlocutory appeal brought pursuant to Rule 308. *Simmons v. Homatas*, 236 Ill. 2d 459, 466 (2010). *De novo* consideration means that we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 17                    B. Doctor-Patient and Attorney-Client Privileges

¶ 18    In the case at bar, the parties ask this court, in effect, to triage two well-established privileges: (1) the doctor-patient privilege and (2) the attorney-client privilege. The parties interpret the principles set forth in *Petrillo* differently; therefore, we will discuss this case and its progeny in depth.

¶ 19    *Petrillo* was a landmark decision on doctor-patient privilege. In *Petrillo*, the minor plaintiff filed a product liability suit against Syntex Laboratories, Inc., alleging that he was injured from consuming one of its infant formulas. *Petrillo*, 148 Ill. App. 3d at 585. Against the trial court's order, defense counsel attempted to have an *ex parte* communication with one of the plaintiff's treating doctors, and the trial court found counsel in contempt of court. *Petrillo*, 148 Ill. App. 3d at 584. The appellate court in *Petrillo* found that *ex parte* communications between a plaintiff's treating doctor and defense counsel are barred as a matter of public policy, for they compromise the "sanctity" of the doctor-patient relationship. *Petrillo*, 148 Ill. App. 3d at 588. The court found that, in obtaining information or evidence, the defense attorney was restricted to the "regular channels of discovery," including, but not limited to, written interrogatories and depositions. *Petrillo*, 148 Ill. App. 3d at 587. The appellate court based its reasoning on two pillars of public policy: (1) that doctors must abide by their code of ethics, preserving the confidentiality and trust vital to the doctor-patient relationship, and (2) that *ex parte* communications impair doctors' fiduciary duties to their patients. *Petrillo*, 148 Ill. App. 3d at 588.

¶ 20    In support of the confidential doctor-patient relationship, the appellate court stressed that " 'every patient has a *right to rely* upon [his doctor's] warranty of silence.' " (Emphasis in original.) *Petrillo*, 148 Ill. App. 3d at 592 (quoting *Hammonds v. Aetna Casualty & Surety Co.*, 243 F. Supp. 793, 801 (1965)). When patients file suit, they do not nullify this warranty, they do not implicitly consent to their doctors revealing medical confidences to parties beyond the normal bounds of discovery, and they do not authorize doctors to divulge their information in *ex parte* communications with their legal adversaries. *Petrillo*, 148 Ill. App. 3d at 591. That is, the confidential doctor-patient relationship endures, even where the patient initiates a lawsuit and assents to disclosure of pertinent information through traditional methods of discovery. *Petrillo*, 148 Ill. App. 3d at 591.

- 4 -

¶ 21    In the case at bar, plaintiff supports her argument using the holding provided in *Petrillo*. The *Petrillo* court found that when a treating doctor is not named as a defendant in the medical malpractice suit, and his care and treatment is not the basis of the suit, his *ex parte* contact with defense counsel is barred, whether or not such contact is harmless or only potentially harmful, due to the mere existence of the doctor-patient relationship. Therefore, plaintiff argues for a clear hierarchy of doctor-patient privilege over attorney-client privilege. In other words, plaintiff believes that the defendant-doctor's right to defend his L.L.C. does not eclipse the doctor-patient privilege. Plaintiff also cites a litany of cases, which have embraced *Petrillo* to its fullest extent. *E.g.*, *Karsten v. McCray*, 157 Ill. App. 3d 1, 14 (1987) (barring a doctor's testimony after the doctor engaged in *ex parte* communications with defense counsel, despite the fact that the doctor-patient relationship existed only prior to the plaintiff's injury); *Mondelli v. Checker Taxi Co.*, 197 Ill. App. 3d 258, 261 (1990) (finding the doctor-patient privilege was violated at the time of an *ex parte* conference between the plaintiff's treating doctor and defense counsel, regardless of what information was actually revealed).

¶ 22    Defendants, on the other hand, stress the significance of preserving the attorney-client privilege. In *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 120 (1982), our Illinois Supreme Court examined the various tests to determine which communications between employees and agents of a corporation and their legal counsel are privileged. *Consolidation Coal Co.*, 89 Ill. 2d at 120. The supreme court adopted the control group test that has been applied in the federal system, and further explained the qualifications of a control group member, finding that "an employee whose advisory role to top management in a particular area is such that a decision would not normally be made without his advice or opinion, and whose opinion in fact forms the basis of any final decision by those with actual authority, is properly within the control group. However, the individuals upon whom he may rely for supplying information are not members of the control group." *Consolidation Coal Co.*, 89 Ill. 2d at 120. Dr. Krygsheld is one of three managing members of the L.L.C., and so not only is his opinion sought by top management, but he is also a member of top management himself. Dr. Krygsheld is a decision maker, and his communications with his legal counsel is privileged.[5]

---

[5]Defendants compare the case at bar to *Kendall v. Liesen*, No. 13 C 3529, 2013 WL 5375527 (N.D. Ill. Sept. 25, 2013), an unreported case. However, we will not cite an unreported case. *State Farm Mutual Automobile Insurance Co. v. Progressive Northern Insurance Co.*, 2015 IL App (1st) 140447, ¶ 101 ("[W]e will not cite an unreported case."); *Skokie Castings, Inc. v. Illinois Insurance Guaranty Fund*, 2012 IL App (1st) 111533, ¶ 15 ("an unreported case" is "not binding on any court"); *People v. Moore*, 243 Ill. App. 3d 583, 584 (1993) ("the decision was unreported and of no precedential value"). "Unreported decisions have no precedential value, and this is even more true for decisions from foreign jurisdictions." *American Family Mutual Insurance Co. v. Plunkett*, 2014 IL App (1st) 131631, ¶ 38; *Burnette v. Stroger*, 389 Ill. App. 3d 321, 329 (2009); *West American Insurance Co. v. J.R. Construction Co.*, 334 Ill. App. 3d 75, 82 (2002) (a "foreign, unreported decision *** is of no precedential value"). Specifically, with respect to unpublished federal cases, this court has held that they do not carry any authority before an Illinois court. *Lyons v. Ryan*, 324 Ill. App. 3d 1094, 1107 n.11 (2001) ("unreported federal court orders" are not "any kind of authority before an Illinois court"); *Sompolski v. Miller*, 239 Ill. App. 3d 1087, 1093 (1992) ("we decline" to follow "an unreported Federal district court decision").

- 5 -

¶ 23    This attorney-client privilege is "a two-way street, protecting both the client's communications to the attorney and the attorney's advice to the client." *People v. Radojcic*, 2013 IL 114197, ¶ 40. The attorney-client privilege recognizes that " 'advocacy depends upon the lawyer being fully informed by the client' " (*Center Partners, Ltd. v. Growth Head GP, LLC*, 2012 IL 113107, ¶ 31 (quoting *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.*, 189 Ill. 2d 579, 585 (2000), quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981))), including the client's right to formulate trial strategy, and the right to have a "full and frank consultation." *Consolidation Coal Co.*, 89 Ill. 2d at 117-18. Defendants argue that preventing Dr. Krygsheld, a control member of defendant L.L.C., from communicating with defense counsel infringes on his ability to protect his corporation and formulate a defense to the lawsuit. Without allowing the *ex parte* communication, the L.L.C. may face serious legal and financial repercussions.

¶ 24                              C. Limitations of the *Petrillo* Doctrine

¶ 25    Defendants argue for a narrow reading of *Petrillo* by relying on *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21, 50-60 (2001). In *Burger*, the Illinois Supreme Court interpreted the *Petrillo* doctrine to mean that a treating doctor may not engage in *ex parte* communications with third parties about the plaintiff's medical care. *Burger*, 198 Ill. 2d at 45. While the events in *Burger* occurred in a hospital, defendants argue that an L.L.C. medical group is similar to a hospital for the purposes of this claim. Defendants cite *Burger* to support the contention that a patient seeking care from a medical corporation has consented to reduced privacy rights, and should expect intraorganization communications regarding care. Defendant also claims that, like a hospital, these intraorganization communications do not qualify as third-party communications under *Petrillo*.

¶ 26    Further, communications among members of a medical group including their attorney are not disclosures to third parties. *Petrillo* finds that the doctor-patient relationship demands that information remain "undisclosed to third parties" (*Petrillo*, 148 Ill. App. 3d at 590), which the supreme court in *Burger* interpreted to mean "parties who otherwise would not possess the information absent the disclosure." *Burger*, 198 Ill. 2d at 57. The supreme court concluded: "The hospital is not a third party with respect to its own medical information, which is compiled by the hospital's own caregivers." *Burger*, 198 Ill. 2d at 57. Although the L.L.C. is not a hospital, it is a corporation which provides medical care as a group. When plaintiff decided to seek the care and treatment of a different doctor within the same medical group, she created a conflict of interest, which was worsened when she filed suit against the corporation of which both her legal adversary and her current treating doctor were managing members. "The knowledge of or notice to an officer of a corporation generally is imputed to the corporation." *People ex rel. Daley v. Warren Motors, Inc.*, 114 Ill. 2d 305, 320 (1986). Plaintiff's medical information was already in the L.L.C.'s possession when she was Dr. Brink's patient, long before she filed suit. Dr. Krygsheld, as one of three managing members of the L.L.C., is not a third party to the information of his own corporation. See *Burger*, 198 Ill. 2d at 57; *Lombardo v. Reliance Elevator Co.*, 315 Ill. App. 3d 111, 120 (2000).

¶ 27    Thus, it makes sense to conclude that, once a plaintiff sues a doctor, the plaintiff necessarily waives some of the protections afforded him by the doctor-patient privilege, and the accused doctor would be severely hampered in his ability to defend himself if he did not have the right to speak with his lawyer privately. This also applies to podiatrists who, although

- 6 -

not sued directly, are part of the control group of the corporate entity that is sued. If we were to find that doctors who are part of the control group are bound by the doctor-patient privilege and that they could not have *ex parte* communications with their lawyers, then we would be finding that doctors who are sued in any capacity are bound by this privilege. We cannot make that conclusion here. *Petrillo* does not preclude *ex parte* communications with the individuals who serve as the corporate heads and who are decision makers of the accused medical or podiatry corporation.

¶ 28                                    D. Conditions

¶ 29    " '[T]he recognition of a privilege does not mean that it is without conditions or exceptions. The social policy that will prevail in many situations may run foul in others of a different social policy, competing for supremacy.' " *Consolidation Coal Co.*, 89 Ill. 2d at 117 (quoting *Clark v. United States*, 289 U.S. 1, 13 (1933)). This case is being decided on the narrow facts presented.

¶ 30    What we want to accomplish in every case is to balance the competing privileges at issue in the interest of justice. In doing so, we have taken into consideration *Petrillo* and its progeny, and have also considered that the purpose of the attorney-client privilege is to encourage and promote a meaningful consultation between a client and his attorney so that the attorney can formulate an appropriate defense to the lawsuit without prejudicing the rights of the plaintiff. However, the *ex parte* communication we are granting to defendants is not without conditions and must be considered the exception, rather than the rule. *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 190 (1991).

¶ 31    Defendant designated Dr. Krygsheld as an expert witness as to liability and as a treating podiatrist as to the nature and extent of the injuries incurred by plaintiff as a result of defendants' negligence. In order to provide plaintiff with the ability to obtain Dr. Krygsheld's testimony before an *ex parte* communication with the corporate attorney concerning only the nature and extent of her injuries, we provide plaintiff the opportunity to take his deposition[6] on that issue only, without allowing any prior *ex parte* communication by the defense. After that deposition has concluded, defense counsel will have the opportunity to have *ex parte* communications with the witness concerning the liability and causation aspect of the case. This *ex parte* communication will concern the issue as to whether any of the other corporate employees or principals deviated from the standard of care in their care and treatment of plaintiff and its resulting causation. That liability portion of the deposition of Dr. Krygsheld will take place on another date unless the parties agree otherwise. The liability and causation portion will occur only after the witness has reviewed and signed the injury deposition pursuant to Illinois Supreme Court Rule 207 (eff. Jan. 1, 1996) so that the witness may speak freely with counsel for defendant L.L.C., of which he is a member. By barring *ex parte* communications until after the injury deposition, we afford plaintiff the opportunity to secure Dr. Krygsheld's testimony on damages without coaching by defense counsel, and to have her privacy interests adequately protected without unnecessarily impinging upon Dr. Krygsheld's right to assistance of counsel for the corporate entity on the liability and causation issue.

---

[6]Plaintiff should have the option of taking a discovery or evidentiary deposition of the witness.

CONCLUSION

¶ 33    The question that was addressed to this court was: does *Petrillo* prohibit a defense counsel, who represents a defendant podiatrist and defendant L.L.C., from conducting *ex parte* communications with plaintiff's treating podiatrist, who is a member of and in the control group of the L.L.C.? The trial court permitted defense counsel to speak to plaintiff's treater and designated expert for liability and causation concerning all aspects of the litigation. We reverse that order and prohibit defense counsel from having any *ex parte* communication with Timothy Krygsheld, D.P.M., until plaintiff had the opportunity to take the doctor's deposition on the issue of the nature and extent of her injury. After the deposition is completed and signed, defense counsel may have *ex parte* communications with the doctor concerning the issues of negligence and causation.

¶ 34    Certified question answered in the negative, with conditions.

¶ 35    JUSTICE LAMPKIN, dissenting.

¶ 36    I respectfully dissent. I would answer the certified question in the affirmative and reverse the trial court's order that granted defendants' motion to engage in *ex parte* communications with Dr. Krygsheld. *Petrillo* held that *ex parte* conferences between defense counsel and a plaintiff's treating physician are prohibited as against public policy because they jeopardize the sanctity of the confidential and fiducial physician-patient relationship. *Petrillo*, 148 Ill. App. 3d at 588. Although the factual situation in *Petrillo* is distinguishable from the instant case, I believe the reasoning behind *Petrillo* is equally applicable here. Accordingly, I would find that *Petrillo* prohibits defense counsel, who represents defendants Dr. Brink and Performance Foot and Ankle Center, L.L.C. (PFAC), from conducting *ex parte* communications with plaintiff's treating physician, Dr. Krygsheld, who is a managing member of PFAC.

¶ 37    Plaintiff's medical malpractice claim alleged that she sustained permanent injuries as a result of Dr. Brink's January 2003 Z-bunionectomy, after which plaintiff developed an infection. In May 2003, Drs. Brink and Krygsheld removed the infected hardware that had been implanted in plaintiff's foot, and thereafter plaintiff saw Dr. Krygsheld for post-surgical appointments. Dr. Krygsheld is not named as a defendant. He is a managing member of PFAC, along with Drs. Brink and Wittmayer. There is no dispute that defendant Dr. Brink, and not Dr. Krygsheld, is the physician for whose conduct defendant PFAC is allegedly liable.

¶ 38    Illinois public policy favors the existence of a confidential and fiduciary relationship between the physician and the patient, and this policy is reflected in the medical profession's code of ethics and the fiduciary relationship between physicians and patients. *Id.* at 587-88. Application of *Petrillo* here would encourage a continuing dialogue between patients and their physicians, whereas a holding that *Petrillo* does not apply would greatly discourage unconstrained communication between a patient being treated at a medical entity and the physician actually treating that patient. See *Ritter v. Rush-Presbyterian-St. Luke's Medical Center*, 177 Ill. App. 3d 313, 317 (1988). Furthermore, the application of *Petrillo* here would not prevent PFAC from communicating with the physician allegedly responsible for plaintiff's injuries, and thus would not prevent PFAC from defending itself from liability. *Id.* at 317-18 (the hospital's right to defend itself does not justify an abrogation of the physician-patient privilege when the hospital sought to communicate with employee-physicians whose conduct

was not a basis for liability as provided for in the complaint); *Morgan v. County of Cook*, 252 Ill. App. 3d 947, 954 (1993) (the defendant hospital is included within the physician-patient privilege when the patient attempts to hold the hospital vicariously liable for the conduct of the treating physician, and the patient has impliedly consented to the release of his medical information to the hospital's attorneys); *Aylward v. Settecase*, 409 Ill. App. 3d 831, 837 (2011) (where a patient intended to hold his treating physician and a medical clinic, which was the physician's employer, liable for the physician's alleged negligence, the clinic could not engage in *ex parte* communications with its employees pursuant to the physician-patient privilege unless and until the actions of the clinic's employees were alleged to be a basis for the patient's injuries).

¶ 39     The holdings in *Ritter* and *Morgan* are applicable in the instant case, notwithstanding the enactment of certain provisions of the Hospital Licensing Act (HLA) (210 ILCS 85/6.17(d), (e) (West 2000)) that created a *Petrillo* exception for hospitals. See *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21 (2001) (the statutory provisions of the HLA concerning the authorized limited communication between the hospital's counsel and medical staff members regarding a patient's care, even though those staff members were not named as defendants in the patient's lawsuit, were constitutional); *In re Medical Malpractice Cases in the Law Division*, 337 Ill. App. 3d 1016, 1023-25 (2003) (within the narrow parameters set forth in subsections 6.17(d) and (e) of the HLA, a defendant hospital's counsel and employees and agents responsible for peer review, defense of claims and risk management may communicate *ex parte* with the hospital's employees or affiliates who provided health care or treatment to the plaintiff patient even though such care or treatment was not alleged to be the cause of the patient's injuries). This HLA statutory exception applies only to hospitals, and there is no basis to extend this exception by judicial fiat to L.L.C.s or corporations when the legislature clearly declined to do so.

¶ 40     "At the very heart of every fiduciary relationship, including that between a patient and his physician, there exists an atmosphere of trust, loyalty, and faith in the discretion of a fiduciary." *Petrillo*, 148 Ill. App. 3d at 595. The fiduciary relationship between the physician and the patient requires, at the very minimum, that the patient who files suit has a right to rest assured that the physician will act in good faith while at the same time complying with court-ordered discovery. *Id.* When a patient files suit, he implicitly "consents only to the release of his medical information (relative to the lawsuit) *pursuant to the methods of discovery authorized by Supreme Court Rule 201(a)* [citation]. A patient certainly does not, by simply filing suit, consent to his physician discussing that patient's medical confidences with third parties outside court-authorized discovery methods, nor does he consent to his physician discussing the patient's confidences in an *ex parte* conference with the patient's legal adversary." (Emphasis in original.) *Id.* at 591.

¶ 41     Here, Dr. Krygsheld was not the allegedly negligent physician. Thus, the physician-patient privilege applies because PFAC and Dr. Brink are not prevented from defending themselves in the lawsuit. Plaintiff sued because of the negligent treatment allegedly administered by Dr. Brink. Plaintiff did not waive her privilege as to treatment given by Dr. Krygsheld, her subsequent treating physician. Although the physician-patient privilege will eventually be broken, it should only occur pursuant to formal discovery methods. PFAC does not show what information that could be obtained in an *ex parte* discussion with Dr. Krygsheld could not be obtained via discovery pursuant to Illinois Supreme Court Rule 201(a) (eff. July 1, 2014). See

*Petrillo*, 148 Ill. App. 3d at 597 (Neither the time nor expense involved in deposing a treating physician "creates such hardship that it is necessary for us to carve an exception into the well-established rules of discovery."). Because the alleged negligence occurred during Dr. Brink's treatment, PFAC is not hindered in preparing an adequate defense to the lawsuit. PFAC's counsel is able to consult with two of the three managing members of PFAC outside the framework of formal discovery. I fail to see the difficulty or prejudice defendants claim exists in preventing *ex parte* communication with Dr. Krygsheld. Any concerns defendants may have about lacking particular input from Dr. Krygsheld concerning this litigation does not warrant a court allowing defense counsel to speak *ex parte* with him.

¶ 42        Defendants argue that *Petrillo* is distinguishable because Dr. Krygsheld is both plaintiff's treating physician and a managing member of PFAC. This distinction, however, does not warrant the creation of an exception to *Petrillo* for medical entities organized as L.L.C.s and/or corporations and their staff or control groups. In plaintiff's medical malpractice claim against PFAC and Dr. Brink, the particular negligence of Dr. Brink is the subject of the litigation. Dr. Krygsheld is not in the same situation as Dr. Brink. Dr. Krygsheld neither participated in nor was responsible for the alleged negligent treatment that plaintiff received. Under the present lawsuit, Dr. Krygsheld is not in danger of being held personally liable. Any fears of repercussions to the value of the L.L.C. medical corporation of which Dr. Krygsheld is but one of the three managing members should not alter the physician-patient privilege. Incorporation gives economic advantages to professionals in forming a medical practice and should not be used as a means to violate a patient's confidences and alter existing statutory and common law. See *Testin v. Dreyer Medical Clinic*, 238 Ill. App. 3d 883, 895 (1992), *vacated on other grounds sub nom. Almgren v. Rush-Presbyterian-St. Luke's Medical Center*, 162 Ill. 2d 205 (1994) (order was not appealable where counsel did not pursue contempt sanction). A financial tie between the treating physician and the corporate defendant does not counterbalance the fundamental interests patients enjoy in the patient-physician relationship. Although the facts of this case are uniquely different from *Petrillo* and its progeny, the confidences known by Dr. Krygsheld are no different from those of other treating physicians.

¶ 43        I disagree with the majority's assertion that plaintiff necessarily waived some of the protections afforded by the physician-patient privilege because she "created a conflict of interest" when she received treatment from multiple doctors within the same medical group and then filed suit against the medical group and the single negligent doctor. *Supra* ¶ 26. The majority's critical observation of plaintiff's conduct also would have to apply to physicians who create a similar so-called "conflict of interest" by organizing their medical groups as corporations and L.L.C.s. Although the majority answers the certified question in the negative, it essentially concedes the error of its position that *Petrillo* does not bar *ex parte* communications with Dr. Krygsheld by invading the province of the trial court and *sua sponte* issuing a discovery order to limit defense counsel's *ex parte* communications with Dr. Krygsheld.

¶ 44        The public has an established and beneficial interest in both the fiducial and confidential qualities of the physician-patient relationship, and the public has an interest in having those qualities safeguarded from conduct that places them in jeopardy. Because *ex parte* conferences threaten the sanctity of the physician-patient relationship while producing no additional information (other than that which is already obtainable through the regular methods of discovery), I would conclude that public policy prohibits *ex parte* communications between

- 10 -

counsel for a medical entity that is not a hospital and a treating physician who is within the control group of the medical entity but whose actions are not alleged to be a basis for the patient's injuries.